**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

---

IN RE:
MARCIA L. CALLAHAN,                                      Chapter 11
              DEBTOR.                            Case No. 06-13513-WCH

---

MARCIA L. CALLAHAN,
              PLAINTIFF,

                                     Adversary Proceeding
v.                                                       No. 07-1141

UNITED STATES OF AMERICA,
              DEFENDANT.

---

**MEMORANDUM OF DECISION**

## I. <u>INTRODUCTION</u>

The matter before the Court is the Complaint filed by Marcia L. Callahan (the "Debtor")

against the United States of America (the "United States") seeking a declaration that certain federal

tax liens for taxes assessed against James C. Callahan ("Callahan"), the non-debtor spouse of the

Debtor, and recorded against property solely owned by the Debtor as the purported nominee and/or

transferee of Callahan are invalid.  The United States asserts that the Debtor, the 121 Westwood

Road Realty Trust, and the A.J. Financial Trust held title to certain real property prior to a Court

approved sale as the nominee and/or alter ego of Callahan, and as such, the United States is entitled

to the sale proceeds currently held in escrow.  Alternatively, the United States contends that the

down payment used to purchase the property, which was purported funded by Callahan, constituted

1

a fraudulent transfer with respect to taxes due and owing to the United States, and/or that funds used to make the mortgage payments by Callahan were encumbered by federal tax liens, enabling it to trace the funds to those held in escrow.  For the reasons set forth below, I will enter judgment in favor of the Debtor.

## II. <u>BACKGROUND</u>

In their Joint Pre-Trial Statement, the parties stipulated to only fifteen facts.[1]  Nonetheless, it appears that the facts are not largely in dispute.[2]  Instead, the inferences which may be drawn from the factual circumstances and their legal significance are the focus of this adversary proceeding.

The Debtor is the wife of taxpayer Callahan.[3]  The Debtor and Callahan were married on February 26, 1979 and have continuously lived together in a marital state ever since.[4]  They have two children, Andrew and Jill, born on June 26, 1980 and October 19, 1984, respectively.[5]

At the time the Debtor and Callahan were married, Callahan had a net worth of approximately $1,500,000, consisting of a fifty percent interest in the Red Boot, Inc., a restaurant

---

[1] Joint Pre-Trial Statement, Docket No. 104, ("JPTS") at ¶¶ II.3-17.  The parties also stipulated to the authenticity of all exhibits and the admissibility of all bank records.  JPTS at ¶¶ II.1-2.

[2] Four witnesses testified at trial: the Debtor, Callahan, the Debtor's son Andrew Callahan, and Paul Crowley, a representative of the Internal Revenue Service ("IRS").  Generally, these witnesses testified credibly.  In particular, both the Debtor and Callahan were calm and forthright.  Any minor discrepancies in their testimony were attributable to simple memory lapses caused by the passage of time.  I further note that the United States provided no witnesses to contradict or rebut either the Debtor's or Callahan's testimony.

[3] JPTS at ¶¶ II.3, 7.

[4] JPTS at ¶ II.4.

[5] JPTS at ¶¶ II.5-6.

company in Canton, Massachusetts, and a twenty-five percent interest in Rocky Point Amusements, Inc., a company which, among other things, operated an amusement park in Rhode Island called Rocky Point Park.[6]  In contrast, the Debtor entered the marriage with only a few thousand dollars.[7] Prior to the marriage, Callahan asked the Debtor to sign a prenuptial agreement, to which she did not object so long as there was some provision for her; namely, a $100,000 life insurance policy.[8] Despite the prenuptial agreement, Callahan testified that it was always their intention that the Debtor would acquire assets "as soon as reasonably possible, meaning houses and real estate."[9]

After the Debtor and Callahan were married, they lived in a rented apartment in Quincy, Massachusetts.[10]  On November 16, 1981, they purchased their first home on 6 Wildewood Drive in Canton, Massachusetts (the "Wildewood Drive Property") for $89,900.[11]  The deed reflects that they took title to the property as joint tenants.[12]  Callahan testified that they paid an initial down payment of $9,900 and financed the remaining $80,000 of the purchase price.[13]  The Debtor testified that they both contributed to the initial down payment.[14]

---

[6] Trans. June 30, 2009 at 15, ¶¶ 9-18.

[7] *Id.* at 113, ¶¶ 8-14.

[8] *Id.* at 112, ¶ 25; 113, ¶¶ 1-7.  *See also* Exhibit 1.

[9] Trans. June 30, 2009 at 61, ¶¶ 2-10.

[10] *Id.* at 16, ¶¶ 15-17.

[11] Exhibit 2.

[12] *Id.*

[13] Trans. June 30, 2009 at 20, ¶¶ 9-19.

[14] *Id.* at 116, ¶¶ 1-2.

On December 24, 1982, Callahan deeded his interest in the Wildewood Drive Property to the

Debtor for the stated consideration of $1.00.[15]  During the trial, Callahan testified that he transferred

his interest because he wanted his wife to own the Wildewood Drive Property for the security of her

and her son.[16]  This sentiment was later echoed by the Debtor.[17]  While Callahan conceded liquor

service liabilities and amusement park liabilities arising from his business ventures were always in

the back of his mind, he credibly stated that the Debtor's security was the primary reason for the

conveyance.[18]

Four years later, the Debtor purchased a new home on 269 Chapman Street in Canton,

Massachusetts (the "Chapman Street Property") for $350,000.[19]  Callahan testified that he was

consulted about the purchase, but that it was the Debtor's decision.[20]  The deed, dated August 20,

1986, reflects that the Debtor was the sole owner of the Chapman Street Property.[21]  The full amount

of the purchase price was financed by two mortgages, with the second satisfied several months later

from the $150,000 in sale proceeds of the Wildewood Drive Property.[22]  Although only the Debtor

signed the mortgages on the Chapman Street Property, both the Debtor and Callahan signed the note

---

[15] Exhibit 3.

[16] Trans. June 30, 2009 at 18, ¶¶ 6-25.

[17] *Id.* at 116, ¶¶ 3-19.

[18] *Id.* at 19, ¶¶ 1-25; 20, ¶¶ 1-8; 53-56.

[19] Exhibit 4.

[20] Trans. June 30, 2009 at 19, ¶¶ 17-25; 57, ¶¶ 1-9.

[21] Exhibit 4.

[22] Trans. June 30, 2009 at 21, ¶¶ 9-25.

4

to Rhode Island Hospital Trust National Bank as obligors for $200,000.[23]  Both the Debtor and

Callahan testified that Callahan signed the note simply because it was a requirement of the bank.[24]

Since the purchase in 1986, the Debtor and Callahan have lived at the Chapman Street Property as

their primary residence.[25]

On January 22, 1988, Callahan established the 279 Chapman Realty Trust, naming himself

as trustee and his children the beneficiaries for the purpose of acquiring the vacant lot adjacent to

the Chapman Street Property, namely 279 Chapman Street.[26]  After acquiring 279 Chapman Street,

Callahan, as trustee, delivered a mortgage to Wollaston Credit Union to secure a loan in the amount

of $157,500, the proceeds of which went to the Debtor.[27]  Notably, the mortgage describes both 279

Chapman Street and the Chapman Street Property as the collateral.[28]  Ultimately, 279 Chapman

Street was sold for $266,000, which Callahan paid to the Debtor.[29]  Callahan testified that once the

trust property was sold, he believed the trust was "no more."[30]  Nonetheless, Callahan maintained

---

[23] Exhibits 6, 7.

[24] Trans. June 30, 2009 at 23, ¶¶ 3-16; 61, ¶¶ 14-25; 62, ¶¶ 1-15; 118, ¶¶ 2-6.

[25] Trans. June 30, 2009 at 64, ¶¶ 7-14.

[26] *Id.* at 64, ¶¶ 24-25; 65, ¶ 1-9; 68, ¶ 25; 69, ¶¶ 1-2.

[27] *Id.* at 65, ¶¶ 13-16.  Neither the note or mortgage were introduced into evidence, so it is unclear whether the funds were borrowed by the Debtor or simply paid to the Debtor by Callahan.

[28] *Id.* at 67-68.  While Callahan testified that he signed the note and mortgage, it is unclear whether the Debtor signed either document.

[29] *Id.* at 68, ¶¶ 24-25.  On page 68 of the transcript, it states that 279 Chapman Street was sold in October, 2007, but on page 70, it states the sale occurred in 2000.  In any event, I find that this discrepancy is immaterial to the issues now before me.

[30] *Id.* at 71, ¶ 10.

5

that the children ultimately received the benefit of the proceeds through payment of school tuition and other child related expenses.[31]

In 1989, the Debtor proposed the purchase of yet another property on 121 Westwood Road in Falmouth, Massachusetts (the "Falmouth Property") for $500,000 as a second residence for her family.[32] Again, Callahan was consulted, but the Debtor made the decision to purchase the Falmouth Property.[33] On June 20, 1989, the Debtor settled the 121 Westwood Road Realty Trust to take title to the Falmouth Property and named herself as trustee.[34] The trust instrument was drafted by Callahan's business partner's attorney. Callahan testified that he could not recall the exact circumstances leading to the selection of this attorney, but explained that he had prior dealings with this attorney and that he and the Debtor were comfortable with him.[35] Moreover, he could not recall whose idea it was to place the Falmouth Property in a trust, but the Debtor testified unequivocally that it was her idea in consultation with an attorney.[36] Although the trust instrument references a schedule of beneficiaries executed on the same date, no such schedule was ever prepared or

---

[31] *Id.* at 70-71. It is undisputed that Callahan and the Debtor paid private school tuition for their two children from sixth grade until they graduated from high school. JPTS at ¶ II.13.

[32] *Id.* at 30, ¶¶ 23-25; 31, ¶¶ 1-4; 132, ¶¶ 21-25; 133, ¶¶ 1-15.

[33] *Id.* at 31, ¶¶ 3-4.

[34] Exhibit 17.

[35] Trans. June 30, 2009 at 74, ¶¶ 13-25; 75, ¶¶ 1-24.

[36] *Id.* at 75, ¶¶ 2-5; 139, ¶¶ 1-14; 176, ¶¶ 5-25; 177, ¶¶ 1-9. The Debtor stated that her intention was that the house would ultimately go to her children, then aged five and nine, and conceded that she needed legal advice in order to facilitate that end ultimately by means of a trust.

6

executed.[37]  On the same date, the Debtor took title to the Falmouth Property as trustee of the 121

Westwood Road Realty Trust.[38]

After an initial down payment of $50,000, the remainder of the $500,000 purchase price of

the Falmouth Property was financed with two mortgages.  The $50,000 down payment came from

the sale of stock of a company doing business as Strawberries Records.[39]  Although the initial

investment in that company was approximately $20,000, neither Callahan nor the Debtor could recall

in whose name the stock was owned or who contributed to the initial investment.[40]  The Debtor, as

trustee of the 121 Westwood Road Realty Trust, granted a first mortgage on the Falmouth Property

in favor of Bay State Federal Savings Bank ("Bay State") in the amount of $250,000.[41]  Both

Callahan and the Debtor, individually and in her capacity as trustee, signed the note as borrowers.[42]

Again, Callahan testified that he signed the note simply because the bank required it.[43]  He went on

to dispute the United States' contention that he had to sign the note because the Debtor's income was

insufficient, stating that the substantial value of the Falmouth Property in relation to the mortgage

---

[37] *Id.* at 137, ¶¶ 2-25; 138, ¶¶ 1-4.  The Debtor testified that she intended that her children
would be the beneficiaries of the 121 Westwood Road Realty Trust, but simply never got around
to preparing the schedule of beneficiaries.

[38] Exhibit 16.

[39] Trans. June 30, 2009 at 32, ¶¶ 18-25; 33, ¶¶ 1-9.

[40] *Id.* at 33, ¶¶ 12-25; 34, ¶¶ 1-9; 78, ¶¶ 22-25; 79-82, ¶¶ 1-5; 134, ¶¶ 7-23.

[41] Exhibit 18.

[42] Exhibit 19.

[43] Trans. June 30, 2009 at 31, ¶¶ 1-25; 32, ¶¶ 1-4.

7

amount rendered the bank adequately protected.[44]  On the same date, the Debtor also executed a note

and second mortgage in the amount of $200,000 in favor of the Crowleys, the sellers of the Falmouth

Property.[45]  Only the Debtor signed that note.

As a result of the Strawberries Records stock sale, Callahan was assessed substantial tax

liabilities, including penalties for failure to make estimated tax payments during the quarter prior to

the purchase of the Falmouth Property.[46]  Despite the IRS's determination, the assessment was the

result of an error in Callahan's tax return made by his accountant.[47]  Ultimately, the error was

discovered and years later much of the tax was abated and Callahan received a refund for substantial

overpayments arising from assets which the IRS had forcibly collected.  Nonetheless, Callahan

testified that he considered himself solvent in June, 1989, based upon his ability to pay his bills as

they became due and the fact that his assets exceeded his liabilities.[48]

The Debtor testified that she worked full time up until 1980, when she gave birth to her son.[49]

Throughout the 1980s the Debtor worked part-time at the Red Boot with no fixed job description.[50]

The Debtor earned no salary from 1990 through 2000.[51]  During this period, approximately 1989 to

---

[44] *Id.* at 76, ¶¶ 8-22.

[45] Exhibit 22; Trans. June 30, 2009 at 32, ¶¶ 5-15; 133, ¶¶ 19-25.

[46] Trans. June 30, 2009 at 102, ¶¶ 23-25; 103, ¶¶ 1-8.  Exhibit 44.

[47] *Id.* at 38, ¶¶ 21-25; 29, ¶¶ 1-11.  Based upon Callahan's tax return, the IRS determined that he owned the stock.

[48] *Id.* at 35, ¶¶ 8-24.

[49] *Id.* at 115, ¶¶ 14-16.

[50] *Id.* at 62, ¶¶ 21-25; 63, ¶¶ 4-9; 164, ¶¶ 16-25; 165, ¶¶ 1-5.

[51] JPTS at ¶ II.11.

2001, Callahan made all mortgage payments on both the Chapman Street Property and the Falmouth

Property and paid other various bills.[52]  The Debtor testified that the monthly mortgage payments

for both properties exceeded $4,500 from 1989 to 1996, and later exceeded $5,900 from 1996 to

2001.[53]  At trial, Callahan explained that he was happy to pay the mortgages from "monies we had"

for the benefit of the Debtor and their children.[54]  Similarly, in 1992, when the Crowleys brought suit

against the 121 Westwood Road Realty Trust for failure to make a balloon payment under the terms

of the note, Callahan testified that he paid off the remaining balance of the note for the benefit of the

Debtor.[55]   The Debtor later testified that despite all these payments, there was never any

understanding or agreement that Callahan would own any interest in either the Chapman Street

Property or the Falmouth Property.[56]

In January, 1993, a balloon payment of approximately $150,000 became due under the terms

of the Chapman Street Property note.  Neither the Debtor nor Callahan were able to pay at that time

and subsequently executed a loan modification with Rhode Island Hospital Trust National Bank

agreement extending the term of the loan for an additional year.[57]  The loan modification agreement,

dated January 12, 1993, identifies both the Debtor and Callahan as borrowers.[58]

---

[52] *Id.* at 72, ¶¶ 7-25; 73, ¶¶ 1-2; 77, ¶ 20.

[53] *Id.* at 184, ¶¶ 20-22; 187, ¶ 25; 188, ¶¶ 1-2.

[54] *Id.* at 82, ¶¶ 19-22.

[55] *Id.* at 82, ¶¶ 7-18.

[56] *Id.* at 135, ¶¶ 5-25; 136, ¶¶ 1-2.

[57] Exhibit 8; Trans. June 30, 2009 at 24, ¶¶ 2-12.

[58] Exhibit 8.  Curiously, on the second page of the loan modification agreement just above the signature lines both the Debtor and Callahan are identified as "Mortgagors."

9

The Debtor and Callahan filed a joint voluntary petition under Chapter 11 on November 2, 1994.[59] Very little information about the 1994 bankruptcy was offered at trial. Generally, the United States focused its questioning on the Debtors' Schedule A - Real Property ("Schedule A") filed in that case. Although not introduced as an exhibit, the testimony elicited from Callahan reflects that they disclosed a fee simple interest in the Chapman Street Property, a one hundred percent beneficial interest in the 279 Chapman Street Realty Trust which owned the adjacent vacant lot, and a one hundred percent beneficial interest in the 121 Westwood Road Realty Trust which owned the Falmouth Property.[60] Thus, Schedule A reflected both the real estate and trusts were owned by Callahan and the Debtor.[61] Though conceding the import of the document and that he signed it, Callahan expressed confusion as to the ownership interests reflect in Schedule A.[62]

Callahan experienced additional tax problems throughout the 1990s. Although the testimony on this point was vague, Callahan was assessed substantial forgiveness of debt income in the early 1990s when a third mortgage in the amount of $322,000 on Rocky Point Park was forgiven due to the failure of Massachusetts Bank & Trust.[63] Ultimately, the amounts due as a result of this were abated in 1992 and 1993.[64] Later, as an officer of Rocky Point Amusements, Inc., Callahan became

---

[59] Case No. 94-44862.

[60] Trans. June 30, 2009 at 84-85.

[61] *Id.* at 85, ¶¶ 13-25; 86, ¶¶ 1-15.

[62] *Id.*

[63] *Id.* at 40, ¶¶ 18-25; 41, ¶¶ 1-2.

[64] *Id.* at 41, ¶¶ 9-19.

10

personally liable for unpaid employment taxes not paid by the business.[65]  Pursuant to 26 U.S.C. §

6672, the IRS assessed liabilities against him in the amounts of $153,867.92 and $6,019.86 for the

quarterly tax periods ending on December 31, 1994 and 1995, respectively.[66]  The assessments for

these periods are dated January 1, 1996 and August 11, 1997, respectively.[67]  Callahan also testified

that he personally borrowed money for Rocky Point Amusements, Inc. and guaranteed some of its

loans.[68]  Aside from the National Loan Investors lawsuit discussed below, no further information was

offered about those guarantees.  Ultimately, Rocky Point Amusements, Inc. closed and filed for

bankruptcy in 1995.[69]

In 1995, Callahan sold his interest in the Red Boot, Inc. and paid the proceeds towards

outstanding Massachusetts state tax obligations.[70]  The following year, Callahan opened another

restaurant known as T.K.O. Shea's, which was incorporated under an entity known as WalCal, Inc.[71]

Ultimately, Callahan obtained a one hundred percent interest in WalCal, Inc. through a buy-out of

the other shareholder.[72]  As before, however, when WalCal, Inc. failed to pay employment taxes for

---

[65] *Id.* at 87, ¶¶ 5-9.

[66] JPTS at ¶¶ II.9-10.

[67] *Id.* at ¶ II.10

[68] Trans. June 30, 2009 at 45.

[69] *Id.* at 88, ¶¶ 22-24.

[70] *Id.* at 88, ¶¶ 24-25; 89, ¶¶ 3-5.

[71] *Id.* at 10, ¶¶ 9-10; 12, ¶¶ 20-25.

[72] *Id.* at 88, ¶¶ 20-22.  Callahan further testified that he never paid the former shareholder
in full and ultimately had a judgment enter against him.  The record is unclear, however, when
this occurred and the amount of the judgment.

11

three quarters of 1998 and all four quarters of 1999, 2000 and 2001, the IRS assessed approximately $247,541.90 against him as the responsible person of WalCal, Inc on September 6, 2004.[73]  Callahan also failed to pay his federal income taxes for the tax year 1998 and was assessed an additional $12,755.23 on March 3, 2003.[74]

In 1996, the Debtor and Callahan were again in default under the terms of the Chapman Street Property note for failure to pay the required balloon payment.  On December 12, 1996, they entered into a loan forbearance agreement with Ocwen Federal Bank, FSB ("Ocwen"), the then holder of the note.[75]  This mortgage was not paid off until November 5, 2001, when the Debtor refinanced the Falmouth Property.[76]

On August 30, 2001, the Debtor, as trustee of the 121 Westwood Road Realty Trust, deeded the Falmouth Property to herself individually for the stated consideration of $1.00 for the purpose of refinancing the Falmouth Property.[77]  The Debtor testified that she did so on her own authority and did not consult the beneficiaries of the trust.[78]  She further explained that she transferred the Falmouth Property out of the trust because she understood that, in anticipation of the refinancing, banks to preferred owners to be individuals rather than trustees.[79]  On the same date, the Debtor

---

[73] JPTS at ¶¶ II.9-10.

[74] *Id.* at ¶¶ 7, 10.

[75] Exhibit 9.

[76] Exhibit 27.

[77] Exhibit 23.

[78] Trans. June 30, 2009 at 140, ¶¶ 20-22.

[79] *Id.* at 141, ¶¶ 1-6.

executed a note in the amount of $500,000 and granted a mortgage on the Falmouth Property to Astoria Federal Mortgage Corporation ("Astoria").[80] The Settlement Statement from this refinancing indicates that after the payment of the Bay State mortgage, the Debtor received cash in the amount of $238,806.81.[81] At trial, she testified that she paid approximately $186,716.63 to pay off Ocwen's mortgage on the Chapman Street Property.[82] The Debtor used the remaining $52,090.18 for school tuition for her children, mortgage payments, and property maintenance costs.[83]

On June 28, 2002, Andrew Callahan settled the A.J. Financial Trust naming himself trustee.[84] Less than two months later, the Debtor transferred the Falmouth Property to Andrew Callahan, as trustee of the A.J. Financial Trust, by deed dated August 8, 2002. The Debtor testified that the purpose of this transfer was to give her son the house to share with his sister in the event that the Debtor died.[85] At trial, Andrew Callahan admitted that although he knew has was both the trustee and a beneficiary of the A.J. Financial Trust, he did not know the difference.[86]

Although the details are not entirely clear, at some point prior to 2001, Callahan guaranteed a loan made to Rocky Point Amusements, Inc. from Massachusetts Bank & Trust.[87] The Debtor also

---

[80] Exhibits 24, 25.

[81] Exhibit 26.

[82] Trans. June 30, 2009 at 144, ¶¶ 1-20.

[83] *Id.* at 144, ¶¶ 21-25; 145, ¶¶ 1-11.

[84] Exhibit 29.

[85] Trans. June 30, 2009 at 145, ¶¶ 22-25; 146, ¶¶ 1-10.

[86] *Id.* at 220, ¶¶ 1-10.

[87] *Id.* at 48-49.

13

signed the promissory note for this guarantee.[88]  After the failure of Massachusetts Bank & Trust,

the claim was sold to National Loan Investors.[89]  When Rocky Point Amusements, Inc. failed to meet

its obligations under the loan, National Loan Investors brought suit against Callahan and the Debtor

as guarantors on October 26, 2000.[90]  In anticipation of a judgment in the case, which National Loan

Investors ultimately received in May, 2001,[91] Callahan recorded a Declaration of Homestead on the

Chapman Street Property on January 12, 2001.[92]  Although Callahan signed the Declaration of

Homestead stating that he "owned, possessed, and occupied" the Chapman Street Property, he

testified that he mistakenly believed that he could record it on the Debtor's behalf to offer her some

layer of protection.[93]  Ultimately, the Debtor and Callahan settled the National Loan Investors matter

for $145,000 with funds borrowed from one Gerald Goulston ("Goulston").[94]

In 2002, the Blue Hill Sports Grille, Inc. was organized with Andrew Callahan, the Debtor's

son, as the sole shareholder for the purpose of operating a restaurant known as the Blue Hill Sports

Grille ("Blue Hill") in Canton, Massachusetts.[95]  At trial, Callahan denied that Andrew Callahan was

the sole owner of Blue Hill because he could not obtain the necessary credit to develop the venture

---

[88] *Id.*

[89] *Id.* at 28-29.

[90] *Id.* at 90, ¶¶ 4-10.

[91] *Id.* at 90, ¶¶ 11-13.

[92] Exhibit 10.

[93] Trans. June 30, 2009 at 30, ¶¶ 2-11.

[94] *Id.* at 90, ¶¶ 14-23.

[95] Trans. June 30, 2009 at 94, ¶¶ 7-15.

14

in his own name.[96]  Although both Callahan and the Debtor indicated that Andrew had some role in Blue Hill, he testified that his only involvement was bartending there a few days a week from August, 2005, to June, 2006.[97]  Ultimately, it is undisputed that Callahan played the primary role in the development and operation of Blue Hill, having overseen construction, negotiated the lease, and kept the books.[98]  Callahan also had access to Blue Hill's bank accounts and had check signing authority.[99]  For all intents and purposes, he was the only manager of Blue Hill.

The Debtor became aware of the Blue Hill venture and had discussed it, presumably with Callahan, for a number of years before it got off the ground.[100]  She testified that she believed in the business and had hoped that it would one day provide employment for all four members of her family.[101]  The Debtor further testified that she studied the demographics for Blue Hill, was familiar with its location, and wanted to be a part of the venture.[102]  In the years that followed, the Debtor's primary role in Blue Hill was that of an investor, periodically refinancing her properties and loaning the proceeds to Blue Hill.  The Debtor testified, however, that during the development stages she also worked with the decorator and hired talent.[103]

---

[96] *Id.* at 94, ¶¶ 16-19.

[97] *Id.* at 96, ¶¶ 16-19; 171, ¶¶ 23-25; 172, ¶ 1; 218, ¶¶ 24-25; 219.

[98] *Id.* at 95, ¶¶ 16-25; 96, ¶¶ 1-4; 170, ¶¶ 2-8.

[99] *Id.* at 99, ¶ 2.

[100] *Id.* at 128, ¶ 25; 129, ¶¶ 1-3.

[101] *Id.* at 128, ¶¶ 17-25; 129, ¶¶ 19-25.

[102] *Id.* at 129, ¶¶ 4-12.

[103] *Id.* at 170, ¶ 14; 171, ¶ 4.

15

On September 16, 2003, the Debtor executed a note in the amount of $422,400 and granted a mortgage on the Chapman Street Property to Astoria.[104]  The Settlement Statement from this refinancing reflects that after repayment of the Goulston loan and costs, the Debtor received cash in the amount of $259,337.60.[105]  Of that amount, the Debtor testified that approximately $9,000 was deposited in the Debtor's and Callahan's joint account at Abington Bank and used for household expenses and tuition.[106]  The remaining $250,000 was deposited in a special account called the JMA Management Account, standing for "Just Marcia and Andrew."[107]  Only the Debtor and Andrew Callahan were signatories on the JMA Management Account.[108]  In December, 2003, the Debtor loaned Blue Hill approximately $50,000 from the JMA Management Account.[109]  The Debtor further testified that the remaining balance of the proceeds from the September, 2003 refinancing of the Chapman Street Property were spent on her daughter's tuition, maintenance and improvements to the Falmouth Property, and mortgage payments.[110]

On April 1, 2004, Andrew Callahan, as trustee of the A.J. Financial Trust, once again reconveyed the Falmouth Property to the Debtor for the stated consideration of $1.00.[111]  The Debtor

---

[104] Exhibit 11.

[105] Exhibit 12.

[106] Trans. June 30, 2009 at 124, ¶¶ 1-21.  Though not relevant to the discussion, Abington Bank subsequently became Santander.

[107] *Id.* at 123, ¶¶ 6-14.

[108] *Id* at 123, ¶¶ 15-17.

[109] *Id.* at 125, ¶¶ 1-16; 127, ¶¶ 2-4.

[110] *Id.* at 128, ¶¶ 3-16.

[111] Exhibit 30.

16

then executed a note in the amount of $750,000 and granted a mortgage in the Falmouth Property

to Option One Mortgage Corporation ("Option One").[112]   According to the Settlement Statement,

after the payment of the Astoria mortgage and costs, the Debtor received $243,925.16 from the

refinancing.[113]   The Debtor testified that she loaned the full amount to Blue Hill by endorsing the

check to it directly.[114]   A mere fifteen days later, the Debtor conveyed the Falmouth Property to the

A.J. Financial Trust.[115]

   The Debtor made one final loan to Blue Hill in October, 2004.   On October 8, 2004, the

Debtor borrowed $85,000 from Goulston and granted him a mortgage on the Chapman Street

Property.   The Debtor testified that the purpose of this loan was to complete the final stages

necessary to open Blue Hill's doors to the public.[116]   This time, rather than endorsing the cash

disbursement check over to Blue Hill, the Debtor testified that, at her direction, Goulston issued a

check for $84,324.50 directly payable to Callahan.[117]   At trial, the Debtor explained that she knew

that the money was going to be used for the restaurant and saw no need for it to pass through her

first.[118]   Nonetheless, the Debtor testified unequivocally that the funds were "absolutely" loaned

---

[112] Exhibit 33, 34.

[113] Exhibit 31.

[114] Trans. June 30, 2009 at 147, ¶¶ 3-11; Exhibit 32.

[115] Exhibit 35.

[116] Trans. June 30, 2009 at 130, ¶¶ 1-10.

[117] *Id.* at 130, ¶¶ 17-25; 131, ¶¶ 1-14; Exhibit 15.

[118] *Id.* at 131, ¶¶ 15-22.

voluntarily.[119]

During the development of Blue Hill, the Debtor returned to work part-time first at T.K.O. Shea's and later at Blue Hill.  The Debtor testified that she had no fixed job description or hours at T.K.O. Shea's, and instead did what was needed, including waiting and busing tables and acting as hostess.  From 2001 to 2006, WalCal, Inc. paid the Debtor was paid $116,050.[120]  In 2004, the Debtor also began drawing a salary from Blue Hill.[121]  Similar to her arrangement with WalCal, Inc., the Debtor had no title, fixed hours or job description.[122]  Prior to Blue Hill filing its own Chapter 11 case on February 17, 2006,[123] it paid the Debtor a total of $9,100 between 2004 and 2006.[124]

Based upon Callahan's unpaid tax obligations from 1991 to 2001, Notice of Federal Tax Liens were recorded on October 7, 2005 against "A.J. Financial Trust, and/or, Nominee of Transferee of James C. Callahan" and "Marcia Callahan Nominee and/or, Nominee of Transferee James C. Callahan" on both the Chapman Street Property and the Falmouth Property.[125]  The Debtor filed a voluntary petition under Chapter 11 on October 5, 2006.  On March 21, 2007, she filed the present adversary proceeding seeking a determination that those tax liens were invalid.  While the

---

[119] *Id.* 131, ¶ 25; 132, ¶¶ 1-2.

[120] JPTS at ¶ II.11.  WalCal, Inc. filed its own bankruptcy proceeding in September 6, 2005.  See Case No. 05-18028-FJB.

[121] *Id.*

[122] Trans. June 30, 2009 at 174, ¶¶ 8-17.

[123] Case No. 06-10359-RS.

[124] JPTS at ¶ II.11.  Though not relevant to the disposition of this case, the parties stipulated that the Debtor also received $5,820 in unemployment compensation from the Massachusetts Division of Unemployment Assistance in 2006.

[125] *Id.* At ¶ II.10.

18

parties were engaging in lengthy discovery, the Debtor filed a motion to sell the Falmouth Property

after receiving an unsolicited offer of $1,329,000. The United States objected, but I granted the

motion to sell over the objection and ordered the proceeds of the sale be held in escrow after

payment of the first mortgage pending resolution of this adversary proceeding.[126]

I held a trial on June 30, 2009 at which time four witness testified and forty-four exhibits

were introduced into evidence. At the conclusion of trial, I took the matter under advisement, and

the parties filed post-trial briefs.

## III. POSITIONS OF THE PARTIES

### The Debtor

The Debtor argues that, consistent with the intent of the parties, she has been the owner and

in full control of the Falmouth Property since it was acquired and that she is not the nominee of

Callahan. She contends that even if federal law governs the case, the Court must look to state law

to determine property rights. Factually, the Debtor contends that there is no evidence in the record

that the down payment used to purchase the Falmouth Property came solely from Callahan, as neither

could recall how the Strawberries stock was held. Moreover, citing *Feinman v. Lombardo*, she

asserts that when property is paid for by one spouse and title is taken by the other spouse, it is

presumed that the non-paying spouse takes title by way of gift.[127] The Debtor further argues that this

presumption applies to the Falmouth Property because a schedule of beneficiaries was never

prepared for the 121 Westwood Road Realty Trust, causing it to fail under Massachusetts law.[128]

---

[126] JPTS at ¶¶ 14-15.

[127] *Feinman v. Lombardo*, 214 B.R. 260, 267 (D. Mass. 1997).

[128] *See Arlington Trust Co. v. Caimi*, 414 Mass. 839, 848, 610 N.E.2d 948 (1993).

19

Alternatively, the Debtor argues that even if the gift presumption does not apply, the United States has not shown that Callahan either paid the full purchase price for the property or that the parties intended that he take a specific and definite interest in the Falmouth Property as a result of his contribution.

To the extent that the United States asserts that the down payment constituted a fraudulent transfer by Callahan, the Debtor notes that no outstanding taxes were assessed against him until 1996, which was seven years after the purchase of the Falmouth Property. Moreover, she argues that the United States failed to show that Callahan, as a prerequisite to a fraudulent transfer, was insolvent or rendered insolvent at the time of the transfer. Finally, relying on *Phelps v. United States*, the Debtor contends that the United States has not "distinctly traced" any mortgage payments made by Callahan on the Falmouth Property with funds encumbered by federal tax liens.[129]

<u>The United States</u>

In summary, the United States contends that the Debtor, the 121 Westwood Road Realty Trust, and the A.J. Financial Trust were nominees and/or alter egos of Callahan, allowing its federal tax liens to attach to the Falmouth Property sale proceeds held in escrow. The United States argues at length that federal law should govern the determination of the nominee and alter ego theories in this case, asserting that they serve as equitable remedies in situations where taxpayers deliberately arrange their affairs in a manner to prevent property rights from arising under state law. Moreover, while conceding that courts have split on the subject, the United States argues that cases that rely on state law ignore the Supreme Court's decision in *United States v. Kimbell Foods, Inc.*, which held that when dealing with controversies effecting federal programs courts should consider whether there

---

[129] *Phelps v. United States*, 421 U.S. 330, 334-335 (1975).

is a need for a nationally uniform body of law, whether application of state law would frustrate specific objectives of federal programs, and the extent to which federal law would disrupt commercial relationships predicated on state law.[130]

Applying federal law to the facts of this case, the United States contends that Callahan was a sophisticated businessman and an experienced investor who used the Debtor, and later various trust entities, to put the Chapman Street Property and Falmouth Property beyond the reach of his creditors. The United States asserts that Callahan, who was in fact the true owner of Blue Hill, directed the Debtor to repeatedly leverage these properties to fund his business ventures while otherwise enjoying unfettered access to a home in a desirable summer location.  The United States notes that the Debtor entered the marriage with few assets, did not work for over a decade, and when she did work only did so part time, leaving her income insufficient to pay the mortgages on the properties she purported to own.  As such, all mortgage payments must have been made by Callahan with funds encumbered by the personal tax liens arising from the assessments.  For this reason, the United States contends that it can trace those mortgage payments to the funds held in escrow, and requests additional discovery and, if the parties are unable to arrive at a good faith computation of the payments, an evidentiary hearing.

IV. **DISCUSSION**

A. The Proper Standard

Pursuant to section 6321 of the Internal Revenue Code, the government may impose a lien on property in the hands of a nominee or alter ego of the taxpayer.[131]  It is the burden of the United

---

[130] *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-729 (1979).

[131] 26 U.S.C. § 6321.

21

States as the party seeking to apply this section to prove a person or entity is in fact the nominee or

alter ego of the taxpayer.

The United States spills much ink advancing its argument that federal common law should

be the applicable standard under which its nominee and alter ego theories are determined.  It is well

established that "[t]he threshold question in . . . all cases where the Federal Government asserts its

tax lien[ ] is whether and to what extent the taxpayer had 'property' or 'rights to property' to which

the tax lien could attach."[132]  "In answering that question, both federal and state courts must look to

*state law* . . . ."[133]  The Supreme Court of the United States has explained that:

> We look initially to state law to determine what rights the taxpayer has in the
> property the Government seeks to reach, then to federal law to determine whether the
> taxpayer's state-delineated rights qualify as "property" or "rights to property" within
> the compass of the federal tax lien legislation.[134]

Put another way:

> A common idiom describes property as a "bundle of sticks"-a collection of individual
> rights which, in certain combinations, constitute property. *See* B. Cardozo, Paradoxes
> of Legal Science 129 (1928) (reprint 2000); *see also Dickman v. Commissioner*, 465
> U.S. 330, 336, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984). State law determines only
> which sticks are in a person's bundle. Whether those sticks qualify as "property" for
> purposes of the federal tax lien statute is a question of federal law.[135]

When looking to state law, however, courts must "consider the *substance* of the rights state

---

[132] *Aquilino v. United States*, 363 U.S. 509, 512 (1960).  *See United States v. Craft*, 535
U.S. 274, 278 (2002) ("Whether the interest of respondent's husband in the property he held as a
tenant by the entirety constitutes 'property and rights to property' for the purposes of the federal
tax lien statute . . . is ultimately a question of federal law.  The answer to this federal question,
however, depends largely upon state law.").

[133] *Aquilino v. United States,* 363 U.S. at 512-513 (emphasis added).

[134] *Drye v. United States*, 528 U.S. 49, 58 (1999).

[135] *United States v. Craft*, 535 U.S. at 278-279.

law provides, not merely the labels the State gives these rights or the conclusions it draws from

them."[136]   Essentially, where state law creates a legal fiction that allows an otherwise cognizable

property interest arising under state law to be dispelled, federal law will look past the fiction and

consider the reality of the property interest.[137]   To illustrate, in *Drye v. United States*, the Supreme

Court unanimously held that despite a state law created legal fiction that allowed an heir to disclaim

an inheritance as if he or she had predeceased the decedent, the heir possessed a "right to property"

consisting of the right to accept the inheritance or pass it along.[138]   Similarly, in *United States v.*

*Craft*, the Supreme Court looked past Michigan law which provided that a tenant by the entirety has

no separate property interest and concluded that Michigan law grants a tenant by the entirety some

of the most essential property rights, including the rights to use, exclude others, and receive income

from it, which could be attached.[139]

    With these instructions in mind and for the reasons set forth in the following section, I

conclude that an application of a federal standard to the United States' nominee and alter ego

theories would not alter the result in this case.[140]

---

[136] *Id.* at 279 (emphasis added).

[137] *Id.*

[138] *Drye v. United States*, 528 U.S. at 59-61.

[139] *United States v. Craft*, 535 U.S. at 283.

[140] As I base my reasoning on two Supreme Court cases which post-date *United States v. Kimbell Foods*, 440 U.S. 715 (1979), I reject the United States' contention that it mandates the application of a federal standard to tax collection cases.

B. <u>Nominee and Alter Ego Theories</u>

The United States alleges:

(1) that the 121Westwood Road Realty Trust was the nominee and/or alter ego of Callahan;

(2) that the Debtor was the nominee of Callahan; and

(3) that the A.J. Financial Trust was the nominee and/or alter ego of Callahan.[141]

Because my findings with respect to one entity will impact the others, I will address each separately in the order set forth above.

In simple terms, a nominee is one who holds bare legal title to property for the benefit of another.[142] "The nominee theory focuses upon the taxpayer's relationship to a particular piece of property. The ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership."[143]

Massachusetts law does not recognize a nominee theory or any other analogous remedy with respect to taxpayer liability. Because it will not effect the result of my decision, I will assume, *arguendo*, that federal law applies to the nominee analysis. To determine whether an existing interest in property is reachable to satisfy a federal tax lien, courts have considered the following

---

[141] JPTS at ¶ IV.1-3. The United States argues for the first time in its Post- Trial Brief that Blue Hill and JMA Management Trust are also the alter egos of Callahan. Neither of these issues were raised in the Joint Pre-Trial Statement and are waived. JPTS at ¶ IV ("The following issues of law, and no others, remain to be litigated.").

[142] *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001) (*citing* Black's Law Dictionary (7th ed. 1999)).

[143] *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) (*citing Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005) and *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000)) (internal citation omitted).

24

factors:

> (1) Whether no consideration or inadequate consideration was paid by the nominee for the property and/or whether the taxpayer expended personal funds for the nominee's acquisition;
> (2) whether property was placed in the nominee's name in anticipation of a suit or the occurrence of liabilities;
> (3) whether a close personal or family relationship existed between the taxpayer and the nominee;
> (4) whether the conveyance of the property was recorded;
> (5) whether the taxpayer retained possession of, continued to enjoy the benefits of, and/or otherwise treated as his or her own the transferred property;
> (6) whether the taxpayer after the transfer paid costs related to maintenance of the property (such as insurance, tax, or mortgage payments);
> (7) whether, in the case of a trust, there were sufficient internal controls in place with respect to the management of the trust; and
> (8) whether, in the case of a trust, trust assets were used to pay the taxpayer's personal expenses.[144]

Consideration of these factors, however, is the second part of the inquiry.[145]  First, I must determine whether under Massachusetts law Callahan held an existing interest or right in the Falmouth Property.

Under Massachusetts law, "[g]enerally speaking, it is presumed that when one party pays the purchase price of property, but title is placed in the name of another, the latter holds the property in a resulting trust for the payor. That is, the payor intended the benefit of the property to inure to him or her, not the title holder."[146]  "In contrast, when the transfer is between spouses, the presumption

---

[144] *Dalton v. Commissioner of Internal Revenue*, No. 23510-06L, 2008 WL 2651424 *4 (U.S. Tax Ct. July 7, 2008).  See also Spotts v. United States, 429 F.3d 248 (6th Cir. 2005); *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 729 (11th Cir. 1989); *United States v. Marsh*, 114 F.Supp.2d 1036, 1043 (D. Hawaii 2000).

[145] *Dalton v. Commissioner of Internal Revenue*, 2008 WL 2651424 *4.

[146] *Feinman v. Lombardo*, 214 B.R. 260, 267 (D. Mass. 1997) (*citing Robinson v. Robinson*, 366 Mass. 582, 585, 321 N.E.2d 637, 639 (1974); *Frank v. Frank*, 335 Mass. 130, 135, 138 N.E.2d 586, 588 (1956); *Ross v. Ross*, 2 Mass.App.Ct. 502, 508, 314 N.E.2d 888, 893

is that the payor intended the title holder to take the property by way of a gift, rather than holding it in a resulting trust."[147]  This is often referred to as the marital presumption.[148]  Either presumption is rebuttable by a showing of clear and convincing evidence of a contrary intent.[149]

The United States argues that the marital presumption is inapplicable in the present case because the Debtor took title to the Falmouth Property as trustee of the 121 Westwood Road Realty Trust and not in her individual capacity.  That would be true but for her failure to prepare a schedule of beneficiaries.  In *Arlington Trust Co. v. Caimi*, the Supreme Judicial Court of Massachusetts held that where a settlor deeds property to himself as trustee and *fails to designate a list of beneficiaries in the manner described in the trust instrument*, the conveyance is a nullity and the trust never comes into existence.[150]  "Where the owner of property declares himself trustee for persons to be selected by him, the selection to be wholly within his control, no trust is created and the settlor continues to hold the property for his own benefit."[151]

Article II of the Declaration of 121 Westwood Road Realty Trust required the Debtor, as trustee, to execute a schedule of beneficiaries.[152]  It is irrelevant that she may have intended her children to be the beneficiaries because she failed to do what the declaration of trust required.

---

(1974); Restatement (Second) of Trusts § 440 (1976); 76 Am.Jur.2d Trusts § 169 (1992)).

[147] *Id.*

[148] *Id.*

[149] *Ross v. Ross*, 2 Mass.App.Ct. 502, 508, 314 N.E.2d 888 (1974).

[150] *Arlington Trust Co. v. Caimi*, 414 Mass. 839, 848, 610 N.E.2d 948 (1993).

[151] *Id.* (quoting 2A Scott, Trusts § 112, at 157 (4th ed. 1987)).

[152] Exhibit 17.

Therefore, the 121 Westwood Road Realty Trust failed for want of a beneficiary, rendering it a nullity.

When the 121 Westwood Road Realty Trust failed, under Massachusetts law, the Debtor took title to the Falmouth Property in her individual capacity. As such, the marital presumption applies. To establish Callahan holds a beneficial interest in the Falmouth Property in a resulting trust, the United States must prove that at the time of the conveyance, Callahan provided either the entire purchase price for the Falmouth Property or that he paid a specific and definite amount toward the purchase price which entitles him to an exact or definite interest in the Falmouth Property which the parties intended him to take in return for his contribution.[153] "[P]ost-conveyance payments are relevant only if the parties intended these payments to act as the 'contemplated consideration for the conveyance.'"[154]

Here, the United States has not carried its burden. First, although the down payment for the Falmouth Property came from the Strawberries Records stock sale, neither the Debtor nor Callahan could recall in whose name it was held or who contributed to the initial investment. As such, it is impossible to determine the definite amount Callahan contributed. Second, even if the Strawberries Records stock was held in Callahan's name solely, he did not pay the entire purchase price. Under the terms of the Bay State note, both Callahan and the Debtor were jointly and severally obligated

---

[153] *Feinman v. Lombardo*, 214 B.R. at 267-268 (*citing MacNeil v. MacNeil*, 312 Mass. 183, 187, 43 N.E.2d 667, 670 (1942); *Druker v. Druker*, 308 Mass. 229, 230-31, 31 N.E.2d 524, 525 (1941); *Karas v. Karas*, 288 Mass. 460, 462-63, 193 N.E. 18, 19 (1934); *Dwyer v. Dwyer*, 275 Mass. 490, 494, 176 N.E. 619, 620 (1931); *O'Brien v. O'Brien*, 256 Mass. 308, 309, 310, 152 N.E. 80, 80, 81 (1926); *Bailey v. Hemenway*, 147 Mass. 326, 328, 17 N.E. 645, 646-47 (1888)).

[154] *Id.* at 268 (*quoting Goldman v. Finkel*, 341 Mass. 492, 494, 170 N.E.2d 474, 475 (1960); *Saulnier v. Saulnier*, 328 Mass. 238, 240, 103 N.E.2d 225, 226 (1952)).

to repay the mortgage to the same extent as the other.  I further note, however, that Callahan's liability on the Bay State note was discharged when the Debtor refinanced the Falmouth Property in 2001.  Third, while Callahan paid off the balance of the Crowley mortgage in 1992, the payment was not made at the time of the conveyance nor was there any evidence that the parties intended that he take an interest in the Falmouth Property as a result.  To the contrary, Callahan testified that he paid the mortgage for the Debtor's benefit and she repeatedly testified that the Falmouth Property was always intended to be solely hers.  Lastly, any mortgage payments paid by Callahan fail for the same reason.

Having concluded that the marital presumption applies and that the United States has not rebutted that presumption, I find that Callahan does not have a legal right or interest in the Falmouth Property under Massachusetts law.  To be clear, the marital presumption does not create any legal fiction which federal law would disregard in the same manner as the cases discussed above.  In both *Drye v. United States* and *United States v. Craft*, the Supreme Court found a property right arising under state law that was otherwise re-characterized by state law.  In contrast, the right at issue here does not arise until after application of the Massachusetts resulting trust presumptions dictating who holds the right, as there is no other way to construe the transaction.  Therefore, in the absence of a right or interest in the Falmouth Property under state law, the nominee inquiry ends here with respect to the Debtor.

Admittedly, the marital presumption would not apply to mortgage payments Callahan made while the Falmouth Property was held by the A.J. Financial Trust because a trust is not a spouse.  The United States contends that the A.J. Financial Trust is the nominee or alter ego of Callahan because there were a "flurry of transfers" between the Debtor and the A.J. Financial Trust for the

28

purpose of refinancing the Falmouth Property to the ultimate benefit of Callahan, the beneficiaries of the A.J. Financial Trust were his close relatives, he had unlimited use and enjoyment of the trust property, he repeatedly availed himself of the equity in the Falmouth Property for his business ventures, and there was no evidence that the trustee ever exercised control over the property by limiting the scope of Callahan's use or enjoyment of the property. I note that this theory, and much of the United States' case, is largely bootstrapped to the premise that the Debtor is the nominee of Callahan. While I have already found otherwise, a brief discussion of the merits of that claim in conjunction with my analysis of A.J. Financial Trust's alleged nominal and/or alter ego status is warranted.

To set the stage, alter ego theory is similar in some respects to a nominee theory. The United States explains that the principal difference between the two is that rather than simply looking to nominally held property, alter ego theory "imposes liability on the premise than [sic] an entity and an individual or two entities should be treated as one and the same for purpose of liability for a debt."[155]  In many jurisdictions, alter ego theory is more commonly referred to as piercing the corporate veil.

"In Massachusetts, corporations and their shareholders are generally deemed to be distinct legal entities . . . [but] under unusual circumstances, a court may disregard the corporate form, particularly to defeat fraud or remedy an injury."[156]  In *My Bread Baking Co. v. Cumberland Farms, Inc.*, the Supreme Judicial Court of Massachusetts described two circumstances where piercing the corporate veil is appropriate:

---

[155] Docket No. 115 at 4.

[156] *Aoki v. Atto Corp. (In re Aoki )*, 323 B.R. 803 (1st Cir. 2005).

(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.[157]

Adopting this standard, the United States Court of Appeals for the First Circuit in *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.* set forth twelve factors to consider when deciding whether to pierce the corporate veil:

(1) common ownership;
(2) pervasive control;
(3) confused intermingling of business activity, assets, or management;
(4) thin capitalization;
(5) nonobservance of corporate formalities;
(6) absence of corporate records;
(7) no payment of dividends;
(8) insolvency at the time of the litigated transaction;
(9) siphoning away of corporate assets by the dominant shareholders;
(10) nonfunctioning of officers and directors;
(11) use of the corporation for transactions of the dominant shareholders; and
(12) use of the corporation in promoting fraud.[158]

These factors are a non-exclusive list to be considered when applying the Supreme Judicial Court's *My Bread* standard.[159]

The United States proposes I use a different set of twelve non-exclusive factors developed by federal case law in performing the alter ego analysis. These factors are:

(1) whether the taxpayer treats the entity's property as his own;

---

[157] *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748, 752 (1968).

[158] *Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 16 (1st Cir. 1985).

[159] *Birbara v. Locke*, 99 F.3d 1233, 1238 (1st Cir. 1996).

(2) consideration paid by the entity for the property if a transfer was involved;

(3) the taxpayer's express intent to shelter assets by a trust;

(4) the taxpayer's control over operations and decisions of the property;

(5) the lack of control by the trust or trustees, or corporate officers or directors;

(6) the relationship between taxpayer and the trustees or corporate officers;

(7) whether the taxpayer capitalized the corporation or settled the trust in anticipation of a lawsuit or liability;

(8) whether the taxpayer continues to enjoy unfettered use of the trust property;

(9) retention of possession by the taxpayer of the trust property;

(10) whether the trust fails to interfere with the taxpayer's use of trust property;

(11) failure to record conveyance (where one is involved); and

(12) expenditure of personal funds by the transferor to purchase and maintain the property.[160]

I note that several of these factors arise in federal nominee cases rather than alter ego cases.[161] While that does not, by itself, render those factors necessarily inconsistent with a finding under an alter ego theory, it is important to remember that piercing the corporate veil is a higher standard than a nominee determination because veil piercing results in the individual or entity being treated as another for purposes of all liabilities. Nonetheless, because the *Pepsi-Cola* factors are non-exclusive, I will consider the factors advocated by the United States and, if necessary, will weigh them appropriately.

The United States asserts that Callahan directed the Debtor and the various entities under her

---

[160] Docket No. 115 at 11. (*citing Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 729 (11th Cir. 1989); *Labadie Coal Co. v. Black*, 672 F.2d 92, 98-99 (D.C. Cir. 1982); *United States v. Marsh*, 114 F.Supp.2d 1036, 1043 (D. Hawaii 2000); *City View Trust v. Hutton*, 1998 WL 1031525 *10 (D. Wyo. Nov. 2, 1998); *United States v. Stonier*, 73 A.F.T.R. 2d 94-2084 (D. Colo. 1994); *In re Richards*, 231 B.R. 571, 578 (Bkrtcy. E.D.Pa. 1999)).

[161] *See, e.g., United States v. Marsh*, 114 F.Supp.2d at 1043 ("The following factors have been considered by courts in making the nominee determination: (1) whether the taxpayer exercises dominion and control over the property while the property is in the nominee's name; (2) whether the nominee paid little or no consideration for the property; (3) whether the taxpayer placed the property in the trust's name in anticipation of a lawsuit or liability; (4) whether there is a close relationship between the nominee and the taxpayer; (5) whether the nominee fails to interfere with the taxpayer's use of the property; and similarly (6) whether the taxpayer continued to enjoy the benefits of the property after it transferred the assets to the nominee.").

allegedly nominal control to refinance the Chapman Street Property and the Falmouth Property repeatedly so that he could avail himself of the proceeds for his own uses while simultaneously protecting the properties from his creditors.  I find, however, that this assertion is inconsistent with the evidence adduced at trial.  First, the record is devoid of any evidence that Callahan asked, let alone directed, his wife to take any action with respect to the Chapman Street Property, the Falmouth Property, any trust, or Blue Hill.  In contrast, the record is replete with examples of the Debtor acting in a manner consistent with her stated intentions and interests.  Regardless of whether Blue Hill was really Callahan's business and Andrew Callahan was just his straw,  the uncontradicted testimony of both the Debtor and Callahan is that she made her own decision to become involved with Blue Hill and loan it money.  The Debtor credibly testified that she evaluated the investment and was motivated by her belief that it would be successful and provide work for her entire family. Moreover, while she may not have been a co-owner or manager, her testimony reveals that she was certainly more involved in Blue Hill than simply acting as an ATM card for Callahan.

The Debtor is not wholly unsophisticated.  Viewed in total, the Debtor's testimony reflects that she is a bright and motivated woman who has spent considerable time around others engaged in various business ventures.  The failure of the 121 Westwood Road Realty Trust suggests that she lacks a certain level of understanding with respect to the transactions in which she engaged, but it still demonstrates that the Debtor had her own goals and a basic understanding of how to accomplish them.

I am equally unpersuaded by the United States' contention that Callahan had unlimited and unfettered enjoyment of the Falmouth Property (and the Chapman Street Property).  Although he and the Debtor are separate economic beings, the reality is that they are married and that the Falmouth Property, at least in colloquial sense, was still their home.  The fact that Callahan occupied and

32

enjoyed the property with his family as his home, without more, does not rise to unlimited and unfettered use simply because his interests align with that of his wife's more often than not.

In order to rise to the level of use that would warrant a finding of nominal control, Callahan would have had to act in a manner inconsistent with the Debtor's sole ownership rights and truly treat the property as if it was his own. As has been discussed at length, that was simply not the case here.[162] The Debtor, not Callahan, repeatedly leveraged the Falmouth Property. She credibly testified that she did so for her own reasons and used the proceeds to pay her children's tuition, her mortgage payments and maintenance costs on her properties, and to fund an investment in which she was involved.

The United States also makes much of the fact that Callahan conceded that when he transferred the Chapman Street Property to the Debtor and when she purchased the Falmouth Property, he had the possibility of liabilities arising from his various business ventures in the back of his mind. Nonetheless, he credibly testified, repeatedly, that he transferred his interest in the Chapman Street Property and supported her purchase of the Falmouth Property because he wanted her to have security and assets of her own. Moreover, although doom could have struck at any time, the United States never proved that Callahan was insolvent or otherwise incapable of paying such liabilities out of his other assets.[163] In fact, the notion that the Debtor owned the properties on Callahan's behalf to keep them away from his business creditors is undercut by the United States'

---

[162] The only evidence in the record that Callahan treated either property as more than his home in the colloquial sense is that he recorded a declaration of homestead on the Chapman Street Property declaring that he was the owner. Exhibit 10. Even then, he testified credibly that he did so in anticipation of National Loan Investors obtaining a judgment against both him and the Debtor, believing he could file the homestead on her behalf to offer some protection.

[163] I note that the only testimony regarding Callahan's financial condition was that his net worth in 1978 was approximately $1,500,000.

concurrent theory that the properties were repeatedly leveraged for Callahan's personal uses. On the one hand, the properties were safe from tort liabilities, but, other hand, were ultimately exposed to and used to fund increasing contractual liabilities. In any event, I find that the Debtor's ownership of the Falmouth Property was not simply an effort by Callahan to put it beyond the reach of his creditors.

Returning now to the A.J. Financial Trust, there is more evidence in the record to suggest that it was the nominee and alter ego of the Debtor than Callahan.[164] The uncontradicted testimony is that the Debtor was in control of the Falmouth Property at all times. The Debtor, and not Callahan, attempted to place the Falmouth Property in trust. There is no evidence that she did so at his direction. The Debtor then directed the trustee to deed it to her even though she was neither a trustee nor a beneficiary. After leveraging the Falmouth Property, she returned it to the A.J. Financial Trust where it sat nominally until she required use of it again. Beyond living in the Falmouth Property with his family, there is no evidence that Callahan exercised any kind of control over the A.J. Financial Trust. As such, I find that it was neither his nominee nor his alter ego.

C. Lien Tracing Theory

As previously stated, 26 U.S.C. § 6321 provides that "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."[165] Moreover, "[u]nless another date is specifically fixed

---

[164] I suspect that the United States would agree with this, provided I had already found that the Debtor was the nominee of Callahan.

[165] 26 U.S.C. § 6321.

by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed . . . is satisfied . . . ."[166]  Once a lien attaches "'[t]he lien reattaches to the thing and to whatever is substituted for it. . . . The owner and the lien holder, whose claims have been wrongfully displaced, may follow the proceeds wherever they can *distinctly trace* them.'"[167]

In the present case, the earliest tax lien arose on January 1, 1996, when Callahan was assessed $153,867.92 for tax liabilities that arose in 1994.  The United States argues that Callahan admitted that he made the mortgage payments on the Falmouth Property until 2001.  The subsequent mortgage payments were funded in large part by loans against the equity in the Falmouth Property, none of which it claims, can be traced to funds contributed by the Debtor.  Therefore, it asserts that it is entitled to trace its liens from those payments to the funds held in escrow.

The United States, however, failed in its burden to *distinctly trace* any funds from Callahan to the Falmouth Property.  Indeed, they essentially concede as much in their post-trial brief, and request an additional opportunity to do so.[168]  Instead, the United States has focused on the premise that Callahan was the only person who could have been making mortgage payments on the Falmouth Property, and to the extent that payments were made, it had to be with funds encumbered by a tax lien that they could trace if given the opportunity.  Not only did the Debtor dispute that premise by stating that she made mortgage payments from funds taken from the equity of the Falmouth Property and Chapman Street Property, the United States was given that opportunity on June 20, 2009 and

---

[166] 26 U.S.C. § 6322.

[167] *Phelps v. United States*, 421 U.S. at 334-335 (*quoting Sheppard v. Taylor*, 30 U.S. 675, 710 (1831)).  *See Markham v. Fay*, 74 F.3d 1347 (1st Cir. 1996).

[168] Docket No. 115 at 25.

failed to show that Callahan made a single payment with encumbered funds. Evidence is now closed and the United States must stand on their proof, which in this case, is insufficient.

## V. CONCLUSION

In light of the foregoing, I will enter judgment in favor of the Debtor against the United States.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: November 2, 2009